DEBORAH M. SMITH
Acting United States Attorney

RETTA-RAE RANDALL
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: rettarae.randall@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:05-cr-118-RRB |
| | ) | |
| Plaintiff, | ) | **TRIAL BRIEF OF THE** |
| | ) | **UNITED STATES** |
| vs. | ) | |
| | ) | |
| MICHAEL SARGENT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

I. INTRODUCTION

Michael Sargent ("Sargent") is charged with one count of Theft of Public Property or Records in violation of 18 U.S.C. § 641, and seven counts of Theft of

Property used by Postal Service in violation of 18 U.S.C. § 1707. Sargent has waived a jury trial is this case and the trial by court is set to begin on May 4, 2006 in Anchorage. There are no motions pending before the court.

I.   STATEMENT OF THE CASE

The government expects to prove beyond a reasonable doubt that Sargent, a United States Postal Service ("USPS") employee, stole postage statements from the Business Mail Entry Unit ("BMEU") to the loss and detriment of the USPS. In essence, Sargent accepted bulk mail from permitted business customers and then cleared it for mailing without charging the customers account for the mailing and transferring payment to the USPS. The postage statement is the vehicle summarizing the amount to be paid it is certified by the customer and authorizes the transfer of funds. Sargent then stole the postage statements in order to hide the loss to the USPS.

In April, 2005, Beverly Christie, Manager, Anchorage BMEU, suspected that one of her employees, Michael Sargent, was mishandling business mail. Sargent had worked at the BMEU for 16 years. Christie and other BMEU employees had documented 20 business mailings, representing approximately $12,000 worth of postage, that had been sent to mail processing after being cleared from the BMEU without being entered into the PostalOne system, the computer system from which postage is deducted from business mailers' trust accounts. A trust account is an

account a business mailer establishes with the Postal Service in advance of presenting a bulk mailing. Mailers deposit funds into the trust account, and those funds are deducted from the account when the customer presents a mailing to the BMEU and pays for the postage. The postage statements, the documentation related to the mailings to indicate they had been processed at the BMEU, were missing.

The Business Mail Entry Unit ("BMEU") is the office within the USPS that processes large mailings from business customers. The Anchorage BMEU is located next to the Anchorage Main Post Office at the Anchorage Processing and Distribution Center ("P&DC"). At the BMEU, the typical workflow for a business mailing is as follows:

    a. The business mail customer brings in the mailing along with a "Postage Statement" describing the quantity of mail and the customer's estimate of the postage due. There are several types of Postage Statements, different forms of which are used depending on the class of mail being presented. Statements are designated as different versions of PS Forms 3600, 3602, or 3605.

    b. The Bulk Mail Technician receives the mailing and Postage Statement, and verifies the quantity of mail and quality of the mailing's "readability" (a measure of postal automation' ability to read the address printed on the mailings).

c. The Bulk Mail Technician annotates the Postage Statement with the verification information, and enters the number of pieces mailed and postage due into the customer's PostalOne account. This process deducts postage from the customer's trust account.

d. The PostalOne system generates a PS Form 3607, which serves as proof that the mailing was entered into PostalOne and postage was paid.

e. The Business Mail Technician affixes the PS Form 3607 and a "cleared tag" (a piece of paper reading "CLEARED" with the Technician's initials and date of clearing) to the mailing.

f. The mail handler assigned to the BMEU verifies each mailing has a PS Form 3607 and a cleared tag, compares the mailing with the information of the PS Form 3607, signs the PS Form 3607, and files the documents.

g. The mail handler transports the mailing from the BMEU dock to mail processing.

BMEU employees learned of the "bypassed mailings" (meaning the mailings that were not entered into the PostalOne system) through several avenues: 1) business mail customers called the BMEU to ask why postage had not been deducted from their PostalOne account after they dropped off a mailing; 2) morning BMEU employees discovered mail on the BMEU dock that was labeled "Cleared" the

previous night, but not entered into PostalOne; and 3) BMEU employees noted some business mail customers that typically carried a zero balance had significant funds in their PostalOne accounts.

BMEU Supervisor Art Golez and Business Mail Entry Analyst Uni Han-Norton monitored the BMEU for additional bypassed mailings from January, 2005, to November, 2005. BMEU employees identified 84 bypassed mailings, representing approximately $106,714.18 in lost postal revenue. BMEU employees were able to recapture this lost revenue by contacting the customers directly, obtaining copies of the customers' Postage Statements, and then entering the mailings into PostalOne and deducting the proper amount from the customers' PostalOne accounts.

Han-Norton used to be close friends with Sargent and had worked with him for approximately ten years. Han-Norton and Sargent both applied for the same promotion to the Business Mail Entry Analyst position, but Han-Norton was promoted to the position in December 2004 instead of Sargent. Sargent became angry when he was not promoted and took five weeks of leave. Sargent had told Han-Norton in the past that he would like to see the Postal Service "go bankrupt".

Golez conducted a BMEU procedural review with several BMEU employees, including Sargent, on July 15, 2005. The procedural review reiterated the BMEU

procedures for accepting, verifying, and clearing business mail, including collecting proper postage.

Between October 20, 2005, and December 7, 2005, Sargent was videotaped during his work hours at the BMEU on 21 different weekdays. A summary of these observations are presented below:

| Observations | Number of Days |
|---|---|
| Sargent observed working at the BMEU | 21 |
| Sargent observed placing what appear to be BMEU-related documents into his personal briefcase | 16 |
| Sargent observed leaving the BMEU with his personal briefcase containing BMEU-related documents | 15 |
| Videotape ends before Sargent leaves BMEU | 5 |
| Sargent not observed removing any documents from BMEU | 1 |

On November 4, 2005, Postal Agents collected Sargent's trash from the end of his driveway located at 1320 Heidi Circle, Anchorage, AK. A search through the trash bag found 72 Postage Statements, 21 PS Forms 3607, PostalOne transaction reports, and numerous other original USPS documents. The documents represented 59 different business mailings, primarily between September 2nd through November 2, 2005. Comparing these documents with PostalOne records for the same time period showed that 26 mailings, representing $6,181.85 in postage were entered into PostalOne; the remaining 33 mailings, representing $38,477.03 in postage, were not

entered into Postal One, which means that postage was not collected for these 33 mailings. The documents alleged in Counts 2, 3, and 4 were found as a result of this trash search.

On November 11, 2005, Postal Inspector Hoffman coordinated with Alaska Waste to obtain three trash bags collected from Michael Sargent's home that day. Sixteen Postage Statements, one PS Form 3607, several PostalOne Transactions Summary Reports, and other original BMEU documents were found.  These documents represented 16 different mailings from November 8-10, 2005.  Postal Inspector Hoffman again compared the documents found in Sargent's trash with PostalOne records.  The comparison revealed that nine of the mailings, representing $1,932.40 in postage, were entered into PostalOne.  The remaining seven mailings, representing $5,643.13, were not entered into PostalOne, which means postage was not collected on those seven mailings.  The documents alleged in Counts 5 and 6 were found as a result of this trash search.

On this same day, Postal Inspector Hoffman found a spreadsheet in Sargent's trash that had USPS mailers' names, permit numbers, mail class, pieces, and revenue listed, but the spreadsheet was not a standard USPS spreadsheet or a USPS form. Additionally, the spreadsheet was apparently printed on an inkjet printer, determined by the pixelized print, as opposed to the laser printers used in the BMEU.

Postal Agents compared Sargent's spreadsheet to the bypassed mailings identified by BMEU employees and the postage statements recovered from Sargent's trash. Based on this comparison, it appeared as though the spreadsheet was a list, maintained by Sargent, of the mailings for which he did not charge customers for postage or enter into the PostalOne system. Sargent's spreadsheet covered mailings between March 12, 2005 and November 9, 2005, and at the bottom of the revenue column was a running total in the amount of $436,919.12. The spreadsheet also contained credits for times that Sargent realized the BMEU employees discovered that a mailing had not been entered into the PostalOne system and corrected for it. On the last page of the spreadsheet recovered from Sargent's trash, totals are provided for the number of mail pieces and revenue represented by the mailings. According to Sargent's spreadsheet, approximately 2,235,910 pieces of mail, representing $436,919.12 in lost revenue were, presumably, bypassed through the PostalOne system.

On December 2, 2005, Postal Inspector Hoffman coordinated with Alaska Waste to obtain three trash bags collected from Michael Sargent's residence. He discovered 15 Postage Statements, PostalOne Transaction Summary Reports, and other BMEU documents in the bags. The Postage Statements represented 15 different business mailings from August 18, November 14, and November 16, 2005. The 15

mailings were compared with PostalOne records of the same dates: 10 mailings, representing $10,503,22 in postage, were entered into Postal One; the remaining 5 mailings, representing, $5,795.02 in postage, were not entered into Postal One. The documents alleged in Counts 7 and 8 were found as a result of this trash search.

On December 8, 2005, a federal search warrant was executed on Sargent's personal briefcase. Eleven PostalOne Transaction Summary Reports and an updated version of the mailing spreadsheet previously recovered from Sargent's trash were seized.

On December 8, 2005, Sargent was interviewed after his arrest pursuant to a search warrant, waived his Miranda rights and consented to be interviewed. He also provided a sworn, written statement. Sargent admitted that he did not enter invoices presented to him by mailers. He did this to deprive the USPS of revenue and to "get back" at postal management for being treated poorly. Sargent said he did not benefit monetarily and did not have access to the mailer's funds. He identified the spreadsheet recovered from his garbage and identified the entries. He said that he did not have a particular goal in mind of how much he wanted to ultimately deprive the USPS. He said he had "gotten his pound of flesh."

Also on December 8, 2005, a federal search warrant was executed at the residence of Sargent. Pursuant to the search warrant, 11 Postage Statements were

recovered from Sargent's residence. Those Postage Statements were compared with PostalOne records from December 5. The comparison revealed that of the 11 mailings, 8 mailings, representing $3,921.97 in postage, were entered into PostalOne. Two mailings, representing $2,675.75 in postage, were not entered into PostalOne. The Postage Statement for one additional metered mailing was also recovered.

A search of Sargent's computer revealed a computer file with a Microsoft Excel spreadsheet named "CYA2005rl.xls", password protected with the password "enable 0758". The files contained what appeared to be a spreadsheet Sargent was using to track the bypassed mailings. The spreadsheet indicates the total amount of bypassed revenue as calculated by Sargent to be $449,265.18.

## II. STATEMENT OF THE LAW

Mr. Sargent is not charged in alternative counts; he is charged with 8 felonies of theft. They just have different elements of proof.

A. Count 1.

As to Count 1, Mr. Sargent is charged with a violation of 18 U.S.C. § 641, which alleges that "[b]eginning on or about January 27, 2005, and continuing to at least on or about December 8, 2005, in Anchorage, in the District of Alaska, the defendant, MICHAEL SARGENT, did knowingly steal, purloin, and without authority convey and dispose of any record, voucher, and thing of value in excess of

$1000 of the United States and of any department or agency thereof, to wit: postage statements for business mailings belonging to the United States Postal Service."

The government must prove the following elements beyond a reasonable doubt for Theft of Government Property: 18 U.S.C. §641: (1) the defendant knowingly stole property of value with the intention of depriving the owner of the use or benefit of the property; (2) the property belonged to the United Sates; and (3) the value of the property was more than $1000.

The value of such property in the aggregate must exceed $1000 for a felony conviction. See 18 U.S.C. §641. The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

B.   Counts 2-8:

As to Counts 2-8, the defendant is charged with violating 18 U.S.C. §1707, which allege that Sargent did knowingly steal, purloin, and appropriate property used by the United States Postal Service to his own use and other than its proper use, and conveyed away any such property to the hindrance and detriment of the United States Postal Service, with each stolen document described below constituting a separate and distinct count and with each stolen document exceeding the value of $1000:

| Count | Date | Description |
|---|---|---|
| 2 | 10/31/2005 | Postage statement for AIH/GID mailing (via TNT Bulk Mailing), in the amount of $2,463.68, found in the trash search conducted November 4, 2005. |
| 3 | 10/31/2005 | Postage statement for Anchorage Economic Development Co. mailing (via PIP Printing), in the amount of $1,352.22, found in the trash search conducted November 4, 2005. |
| 4 | 11/1/2005 | Postage statement for UAA mailing (via Alaska Laser Printing), in the amount of $1579.32, found in the trash search conducted November 4, 2005. |
| 5 | 11/9/2005 | Postage statement for Arctic Slope Regional Corp. mailing (via Alaska Laser Printing), in the amount of $1744.42, found in the trash search conducted November 11, 2005. |
| 6 | 11/10/2005 | Postage statement for First National Bank Alaska, in the amount of $1985.53, found in the trash search conducted November 11, 2005. |
| 7 | 11/11/2005 | Postage statement for FedEx Ground, in the amount of $2442.15, found in the trash search conducted December 5, 2005. |
| 8 | 11/14/2005 | Postage statement for Anchorage Daily News, in the amount of $1893.31, found in the trash search conducted December 5, 2005. |

The government must prove the following elements beyond a reasonable doubt for Theft of Property used by Postal Service: 18 U.S.C. § 1707: (1) the defendant knowingly stole or appropriated property used by the Postal Service to his own or any other than its proper use; (2) the defendant appropriated such property to the hindrance or detriment of the Postal Service; and (3) the value of the property was more than $1000.

Under § 1707, the United States must prove only that the property is used by the USPS, while under § 641, it must prove that the property is owned by the United States or one of its agencies.

C.   Value.

The defendant will be arguing that the value for each of the above charges is no more than an aggregate of $1000. Numerous Postage Statements are the basis of the allegations in Count 1, and individual Postage Statements, the face value of each being in excess of $1000, are alleged for the individual Counts 2 through 8.

The Postage Statements, regardless of which PS Form it is, identify, among other things, the bulk mailer, the permit number, the number of pieces to be mailed and the rate to be paid for that type of mailing, all of which is certified by the mailer under the threat of civil or criminal penalty.

As every layperson knows, postage must be fully prepaid on all mail at the time of mailing. See 39 C.F.R. Pt. 3001, Subpt. C, App. A § 3030 (2003). The Postal Statements provide for this by authorizing an amount to be deducted from the mailers trust account with USPS and transferred to USPS for payment via the PostalOne System. These rates are set and the business mailer, to obtain the service, agrees to the cost of the mailing and so certifies. Arguably, these authorizations have a market value, because the mailer can go elsewhere for mailing.

United States v. Starr, 816 F.2d. 94 (2nd Cir. 1987) involves a scheme similar to that before the court, however, a private bulk mailer committed the crime. Starr's company charged their customers the higher rate mailings, and then buried those mailings in lower rate bulk mailings, paying the Postal Service the lower rates, using fraudulent lower postal rates and a false PS Form for the entire shipment. Id. at 96. The resulting surplus was retained by Starr's company; the scheme netted approximately $418,000.

Starr was charged with mail and wire fraud of his customers; the case was reversed by the Court of Appeals for the Second Circuit who, describing this as a case involving a "contract for services" stated that it was the USPS who was defrauded and not the customers. The customers got what they paid for. Id. at 100-101. In Starr the defendants paid USPS less than what was actually owed for the mailings; in Sargent's

case, no payment was made to USPS for the mailings. The USPS has since had to reconstruct the mailings and contact the bulk mailers in order to get reimbursed by them for mailings for which no payment was received. The process is not complete, and whether Sargent will owe any of the loss to the USPS in restitution is yet to be known.

Perhaps Sargent is arguing that the Postage Statements are worth no more than the paper upon which they are written. Market place still determines a paper's value. Discarded carbon paper used in typing grand jury transcripts, which in effect created a third copy of transcripts that could be read and deciphered, was a thing of value within the meaning of 18 U.S.C. §641, when the carbon paper was sold for $300, since the carbon paper was something that the United States rightfully desired to keep in its exclusive possession. United States v. Jeter, 775 F.2d 670 (6th Cir. 1985).

Blank money orders which had been stolen and recovered were found to be property used by the Postal Service under 18 U.S.C. § 1707, and the full value for which each money order could have been cashed was found to be $700. The 1,126 stolen blank money orders were thus found to have a value of $788,688. United States v. Hess, 8 F.3d 821 (4th Cir. 1993). [1]

---

[1] This is an Unpublished Disposition properly cited under CTA4 Rule 36(c).

The United States Coast Guard seized a marijuana-laden vessel off the coast of Florida and hired temporary workers to unload it. The defendant helped himself to a few bales of it and was indicted, tried by a jury, and convicted on one count of theft of government property having a value in excess of one hundred dollars (felony amount for previous version of statute).  United States v. Gordon, 638 F.2d 886 (5th Cir. 1981).  The defendant argued that the marijuana had no value to the government because it was going to be destroyed.  The Court disagreed and stated that "[t]he term value must be liberally construed."   "Value" may also be "thieves' value."  The Postage Statements Sargent took obviously had value to him; he tallied his efforts to get back at and "bankrupt" the USPS, and his final tally was  $449,265.18.

III.     EVIDENTIARY ISSUES

   A.    Stipulations

The parties have not entered into any formal stipulations at this time.  The defendant has verbally agreed to stipulate to the spreadsheet found on Sargent's home computer.

   B.    Statements of the Defendant and Local Rule 2 Notice

The government has previously disclosed, pursuant to Criminal Rule 16(a)(1), all of the defendants' statements that were made to law enforcement officers. Other statements of the defendant's have been provided in the Jencks Act production.

    C.    <u>Reciprocal Discovery Issues</u>

Pursuant to Rule 16, Fed. R. Crim. P., parties to the instant action have been under an obligation of reciprocal discovery. The United States has provided all discoverable items to the defendant and his attorney. As of the present date, the United States has yet to receive a single document or item in discovery from the defendant. To the extent that the defendant attempts to introduce any evidence not provided to the United States pursuant to his obligations under Rule 16(b), the government will seek a preclusion order. <u>See</u> <u>Taylor v. Illinois</u>, 484 U.S. 400, 108 S. Ct. 646 (1988) [upholding constitutionality of preclusion of defense witness withheld from prosecution in violation of discovery rules].

RESPECTFULLY SUBMITTED this 27th day of April, 2006, in Anchorage, Alaska.

DEBORAH M. SMITH
Acting United States Attorney

 s/ Retta-Rae Randall
Assistant U.S. Attorney
222 W. 7th Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: rettarae.randall@usdoj.gov

I declare under penalty of perjury that a true and
correct copy of the foregoing was served electronically
on Mary C. Geddes, Asst. Federal Defender on
April 27, 2006.

s/ Retta-Rae Randall
Office of the U.S. Attorney