**MEMORANDUM**

To:             Patty Wong, Presentence Report Writer

From:           Mary Geddes, Assistant Federal Defender

Date:           July 14, 2006

Re:             United States v. Michael Sargent, Case No.  A05-118 Cr.
                 Objections/Additions to PSR, due July 17, 2006

cc:             Retta-Rae Randall, AUSA

------------------------------------------------------------------------------------------------------------------

**Cover page and para. 9**

The IOS is now scheduled for August 8.

**Cover page**

"Penalty" sections should reflect these are maximums terms and fines you have cited.

**Cover page**

Re: counts of conviction, Counts 5 and 6 are misdemeanors, not class E felonies.

**2nd cover page**

Age is now 48.

1

**Para. 12**

    **To be inserted before (1):**

    A postage statement is a form created by the Postal Service for use by its postal customers. A completed postage statement should accompany every bulk mailing for its delivery to the BMEU.

    **To be substituted  as (2) because it is a more specific and accurate description:**

    The mail may be received and processed by either a Bulk Mail Clerk or a Bulk Mail Technician, who are both "craft employees" of the BMEU. A BMEU employee receives the mailing and Postage Statement and verifies the quantity of mail, the mailing's readability for automation purposes, and whether the mail - as prepared -  qualifies for the discounted rates claimed on the Postage Statement

    The USPS requires that all bulk mailings be pre-paid. The BMEU mail acceptance employees do not cashier payments for postage. Therefore, payments are almost always tendered in another section of the Post Office and a copy of a receipt, reflecting that advance payment, is sent to the BMEU. The customer "trust account" is not an escrow account; but an accounting designation allowing for advance payments by a business mail customer.

The PostalOne! computer application is not integrated with USPS software that shows postage payments have been made elsewhere. Therefore BMEU clerks must therefore manually enter any receipts for these payments into the database.

    **To be substituted as (3) because it is a more specific and accurate description:**

    After his/her inspection of the bulk mailing, the BMEU employee may annotate the Postage Statement with his/her results.

    Next, referencing the customer's "trust account number," the Clerk/Technician then keyboards (or enters) the verification information into a computer with the PostalOne! application, specifying the number of pieces and the type of mail. The PostalOne! System computes the postage due.  PostalOne! registers a debit against the customer's account as a result of the postage due. The PostalOne! application has no ability to access or move the funds provided as advance deposits.

    **Please change in (5):**

    "Bulk Mail Technician" to "BMEU employee" (which encompasses Clerks and Technicians.)

**Para. 16**

    Mr. Sargent has routinely taken a vacation of 4-6 weeks duration at the beginning of the calendar year. Leave is scheduled approximately six months in advance.  He did not suddenly take annual leave in January-February 2005 because he was not promoted.

**Para. 17**

    The initial reference in this paragraph to "several" employees being interviewed is somewhat misleading as all of the statements that follow were made only by one employee, Uni Han-Norton. Mr. Sargent and Ms. Han-Norton stopped speaking to one another as of December 2004, so any comments she attributed to him could not have been made 2005 or during the period of the offense. Mr. Sargent denies that he specifically said he would like the USPS to "go bankrupt," nor was it in his interest if it did. He had on occasions expressed the opinion that the agency, as a government entity, had outlived its purpose. At that time, Ms. Han-Norton expressed a similarly discouraged view of the agency.

2

As for the comment attributed to Mr. Sargent in the last sentence of this paragraph, Mr. Sargent does not recall his exact words, but whatever he said was said in jest and was taken that way. There was no report of a threat to anyone following these conversations, in whatever year they occurred.

## Para. 35

Mr. Sargent does not believe that he said (as quoted here) that he wanted to "'get back'" as the USPS.   Mr. Sargent also did not say that he did not have access to the mailers' funds; he notes that he did have access as he sometimes received checks from mailers, and he always endorsed them and took them to the payment clerks for their deposit.

## Para. 40, 128

Mr. Sargent seeks a specification of what amounts/accounts have not been recovered and are the subject of restitution. Most of the BMEU mailers are longtime and continuing customers

## Para. 40,  47, 125-128

*Value and Restitution*

Mr. Sargent maintains his single court trial issue for purposes of appeal.

Mr. Sargent was charged with felony acts of theft for taking Postage Statements. The defense at trial was limited to the issue of value. Mr. Sargent contended that there were no felony acts of theft because Postage Statements themselves do not have a value exceeding $1000. Postage Statements are estimates prepared by customers for the purpose of expediting the mailing process, but they are not legal tender nor does the language on them authorize a debiting of the advance deposit accounts. The issue of "value" is based upon the statutory language in the government larceny statute which defines the term. The statute says : "'[v]alue' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater." The statements have no such value. The trial court erroneously determined that the "value" of the stolen Postage Statements was the same as the estimates written on the forms.

.      However, regardless of the "value" of these documents for essentially documentary or auditing purposes , it cannot be reasonably argued in this case that the removal of the Postage Statements <u>caused</u> losses for which restitution should be ordered. A loss of revenue occurred <u>because Mr. Sargent was did not make entries into PostalOne!</u> concerning his receipt of the mailing and his observations of the type, weight and quantity of the mailing.  Had Mr. Sargent made these entries, PostalOne! would have computed the postage owed by the customer, registered a debit against the customer's account, and generated the Post Office record (3607) of the transaction. These omissions were not charged as crimes.

While *loss* determinations may encompass relevant conduct, <u>restitution</u> must be limited to losses caused by the offense of conviction. Circuit cases subsequent to *Hughey* <u>prohibit</u> the trial court from ordering restitution for conduct that is related to the offense of conviction, but which is not an element of the offense.

Therefore objection is made to the imposition of any restitution as lacking in statutory authority.

3

**Para. 49:  Objection to enhancement for Abuse of Position of Trust**

## Introduction

The job description for a Bulk Mail Technician does indeed specify that a Technician may serve as a team leader or one or more employees (a reference to Bulk Mail Clerks) and may work alone for 75% of the time. However, the determination of whether the adjustment is applicable does not rest upon a job description; the analysis is a functional one,  concerns itself with the acts constituting the offense, and evaluates whether the offense involved the exploitation of discretionary authority.

The adjustment is not appropriate here.

Although he was a Bulk Mail Technician, his <u>offenses</u> had to do with those duties shared by Technicians and Bulk Mail Clerks. Both employees receive Postage Statements from customers. Both use the PostalOne database to track balances, and to input new mail activity. Clerks and Technicians share the principal function of Mail Acceptance. They are responsible for the  physical labor of mail handling and the data entry involved in Mail Acceptance.

Furthermore,   Mr. Sargent was not unsupervised, nor was he entrusted with managerial and discretionary authority.  Finally, the reality was that, as least as of February 14, 2005, and throughout the reminder of the year until the time of his arrest, Mr. Sargent was closely watched by his BMEU supervisors and trusted with very little.

## The BMEU Positions Were Classified into "Craft" and "Supervisory"

During the relevant time frame, Mr. Sargent was a Bulk Mail Technician in the BMEU. Sun Heo was a Bulk Mail Clerk. Beginning in late May or June, Virgil Davis began working as another Bulk Mail Clerk.[1]  Bulk Mail Clerks and Technicians are similarly classified,  paid, and surveilled.

Clerks and Technicians are classified as "craft employees" and are in the same bargaining unit. The applicable payscales peg a Clerk as Level 5, and a Technician as Level 6.  The salary difference between the two craft positions is about 30 cents an hour, amounting to approximately $1200-1300 per year. Craft employees are required to literally "clock in" and "clock out" for all time, including lunch time. Both positions require the physical movement of mail; indeed, a threshold requirement for employment as either Clerk or Technician is that the individual must have the ability to lift 70 pounds. Although a Bulk Mail Technician may have a greater variety of responsibilities than a Clerk does, the "Mail Acceptance" function shared by both Clerk and Technician has priority over everything else.

Mr. Sargent's crimes were his thefts of Postage Statements from the BMEU. Those were crimes that could have been convicted by anyone in the unit. The Postage Statements contained the Bulk Mail Customers' estimate of the cost of the bulk mailing brought to the USPS for mailing. Anyone in the unit was in a position to receive Postage Statements from customers. Any BMEU employee was in the same position as Sargent to destroy or take Postage Statements.

The BMEU had other positions which are categorized as within the "supervisory or non-

---

[1]The mail handler who removed the mail from the BMEU was not a BMEU employee. The mail handler was supervised by another mail processing employee.

4

bargaining personnel unit." Those positions included the BMEU Analyst, filled in December 2004 by Uni Han-Norton, the BMEU Supervisor, Art Golez, and the BMEU Manager, Beverly Christie. Mail  A different payscale applies to these executive and administrative positions. The Analyst position is pegged at level 15; the Supervisor as either 17/18, and the Manager as 20.

### The BMEU Management Did Not "Trust" Sargent

In 2004, Mr. Sargent had aggressively represented his bargaining unit (Uni Han Norton, Sun Heo and himself ) in limiting management's use of an employee from another unit for overtime BMEU work. It was agreed that Mr. Strong would only be used if his assistance in the BMEU did not effectively displace another BMEU employee who would otherwise be entitled to an overtime opportunity. This agreement was signed by Beverly Christie on April 14, 2004.

However, the settlement failed, as the Union said the Agency had failed to adhere to the agreement. In October 2004, Mr. Sargent therefore resumed the prosecution of the grievance with an appeal.  The appellate complaint was  that overtime had been denied Mr. Sargent and others even though the increased volume of mailings in calendar year 2004 was 20% above normal due to election activity, and the level of craft employee staff was at 75%.  The appeal was supported by correspondence from Sargent, Han-Norton and Heo. Ms. Han-Norton complained that

> Managements [sic] are violating a grievance that settled on April 14, 2004, by not scheduling BME employee to cover the BME function, Managements were still scheduling Mailing Requirement clerk (Eddie Strong)  to cover the breaks, lunch, leave, and eve  during normal work hour in BME. Failed and keep failing to schedule knowledgeable BME employee to cover the BME work by bring Mailing Requirement clerk who isn't comfortable with new Postal One program

In December 2004, there were other developments which increased the tension within the BMEU.  The overtime grievance was still in litigation, and Mr. Sargent was notified that he had not been selected for the position of BMEU Analyst. Mr. Sargent immediately and formally complained, alleging that a less-qualified person had been hired (Bulk Mail Clerk Uni Han-Norton). He said he had been discriminated against because of his protected activity as a union representative and/or because of his race or gender.

### During 2005, Management's Supervision of Mr. Sargent Was Particularly Intense

On December 17, 2004, two days after filing his EEO complaint,  Mr. Sargent received, from his supervisor Art Golez,  a formal "Letter of Warning for Failure to Following Instructions." The Warning cited Mr. Sargent's failure to take his allotted lunch. Mr. Sargent complained that other individuals similarly situated were not disciplined and that skipping lunch was a long-standing practice by he and Ms. Han-Norton, because of the volume of work in the unit. Mr. Sargent said that he had skipped lunch 149 times that year, with no previously imposed sanction. Mr. Golez defined it as an overtime issue.

Mr Sargent complained that the disciplinary letter was further evidence of discrimination. He said that no other employee had ever been disciplined by Golez, even though Han-Norton had also worked through lunches in 2004 and Sun Heo had once poked him (Sargent) repeatedly in the

5

chest during an argument in 1994. Mr. Sargent alleged that the Letter was retaliation for the filing of the EEO complaint, and other representative (and legally protected) actions filed by Mr. Sargent on behalf of the bargaining unit.

Mr. Sargent had been an employee of the Agency for the preceding 29 years (the immediately preceding 16 years in the same work center) without prior disciplinary action. In early January, Mr. Sargent began five weeks of previously-scheduled leave (arranged in August). During his leave he corresponded with the BMEU manager about the climate in the BMEU and his worries concerning Mr. Golez. He also expressed concern that due to Ms. Han-Norton's promotion, the BMEU staffing would now fall to 50% of the staffing needs, and that he was expected to carry the voluminous workload without incurring overtime.

On his return to the BMEU, on February 14, supervisor Golez arranged daily meetings with Sargent. Sargent complained to Christie that these were "interrogations," probably intended to force him out of his job.

In a letter dated February 18, Mr. Sargent complained to Ms. Christie that

> [H]e presented me with a varied "laundry list" of my perceived shortcomings, errors, and deviations from his instructions - some of which dated back as far as mid-December of 2004. I have attempted to comply with his often contradictory instructions while making what I considered my best effort to provide for timely clearance of mail, although being limited to an eight hour shift. My coworker, Sun Heo is presently permitted to work ten hours ...; as we are both aware, the BMEU is currently operating with a 50% complement due to unfilled vacancies. I expressed my concerns that Art was acting in a vindictive and intimidating manner in retaliation for the concurrent grievance, EEO, and NLRB charges that I have been compelled to file regarding the disciplinary letter that he issued me on 17 December 1994. I further assumed that his daily "private meetings" with me were a deliberate attempt on his part to elicit a response that would enable him to impose further discipline that might lead to termination of my employment with the Postal Service.

Throughout February and into March, with even one less BMEU Mail Acceptance position due to Ms. Han-Norton's promotion, the tension between Golez and Sargent escalated. On March 9, 2005, Sargent was warned about a "failure to adhere to the employee vehicle parking policy**."** It was in mid-March that Sargent began by-passing mail, i.e. forwarding mail for processing without doing the keypunching required for PostalOne! accounting.

Sargent continued to worry about getting the mail out and getting fairly paid for the extra work involved, given the reduction of staffing and the use of temporary employees. He believed that Golez had never understood BMEU operations and therefore could not appreciate the length of time. Golez, on the other hand, wanted to avoid the overtime that, during 2004, had nearly doubled the annual salaries due Han-Norton and Sargent. Golez forbid Sargent to work overtime, but only arranged for partial staffing.

In a letter to Manager Christie, Sargent described the 'keying' and 'weighing' work still remaining to be done after other, temporary BMEU staff had departed for the day, and the disparity

6

between the actual volume and the volume projected for this period by the USPS. Sargent also described Golez' latest barrage of criticism following Sargent's efforts to balance his demands.

On Friday, 25 March 2005, I was the only clerk on duty within the BMEU after 1800, as John (detailed from Juneau) had departed at 1730, and Cicely went home sick c. 30 minutes later. The volume for this date totaled 80 transactions - an examination of the transaction history indicates that I was responsible for keying 61 and weighing and receiving all but eight (percentages of 76% and 90%, respectively). The BMEU effectiveness report, as submitted by Mail Acceptance Specialist Don Goetz, indicates a total of 35 mailing statements to be processed at 1900, with a further 17 arriving after this time, for a total of 52. As this was a Friday evening, I was in the not unusual quandary regarding the intent and specifics of Mr. Golez's instructions, i.e., I was directed not to leave any mail over the weekend, not to perform any service off the clock, and, per that week's schedule, to terminate my period of service at my scheduled end tour time of 2330. As it was clearly impossible to comply with all three of these instructions under the circumstances, I elected to extend my tour until c 0120 to perform clearance on all the volume received Friday.

I fully expected to be called to account by Mr. Golez the following Monday, and suffice to say that I was not disappointed. Although I averaged roughly 90 seconds per keyed statement, Mr. Golez proceeded to question and parse each and every period of inactivity. His manner of speech was accusatory, even after I explained the intervals in keying required to actually weigh and verify the volume received and perform clearance of same. Frankly, I worked non-stop all day Friday without break or pause (other than the mandatory lunch period), and was less than amused by Supervisor Golez questioning of both my judgment and work ethic. I performed to the best of my ability under the circumstances, and consider this but another in a series of repetitive events on his part to belittle my performance. He amplified, upon my explanation and objections, that he was "just trying to understand why these tasks involved so much time". I didn't bother to further dignify his gratuitously insulting questions by further elaboration; I consider Mr. Golez to be supremely unqualified as a leader, supervisor, or even as someone with a basic understanding of the process of bulk mail acceptance in it's totality. If the standards of the United States Postal Service are so low as to deem such an individual capable in this regard, I have little choice other than to accept their judgment - I do not fell similarly compelled to allow the burden of his failures to be visited upon me as an individual under his "supervision". Again, I must reiterate, in the

7

strongest possible terms, that I firmly believe it is Mr. Golez's intention to goad me into a response for which I could be further disciplined. Although I have no intention of granting him this "satisfaction", I must insist that the overt and continual pattern of abusive and hostile behavior towards me as an individual cease immediately.

The tension did not abate, but rather accelerated, over time, with Mr. Sargent getting called on the carpet again and again. On March 30, 2005, Mr. Sargent was disciplined, essentially for writing his March 25 letter to Ms. Christie, after work hours and at the BMEU, i.e. for (1) utilizing USPS equipment for "union business" and (2) being on postal premises in a non-paid status.

On May 25, 2005, he was cited for a failure to follow instructions regarding holding standard eligible mail for following day for verification.

On July 11, 2005, he was disciplined for his failure to follow instructions for permitting Friday night clearance of time sensitive material (Alaska Courts of Appeals Opinions). On July 15, 2005, he was investigated - and later cleared - for the unsolicited receipt of a two page FAX transmission. On August 3, 2005, he received another Letter of Warning: Failure to Follow Instructions (2 specifications). On August 19, there was another investigative interview concerning the unsolicited receipt of a one page FAX transmission on August 10.

Even without the special attention he personally received from his supervisors in 2005, it cannot be reasonably said that Mr. Sargent was not subject to much supervision. Like others in his collective bargaining unit, Mr. Sargent was subject to contract conditions that waived his privacy rights in the workplace. Additionally, section 232.1of Title 39 of the Code of Federal Regulations provides that all purses, briefcases, backpacks brought into and removed from a mail facility are subject to inspection upon demand. His supervisors had the access to and the right to conduct searches of his desk, his computer, his vehicle (when parked at work) and his briefcase when leaving the Post Office premises. Surveillance cameras were also mounted in the BMEU, and are operational at least some of the time.

With respect to the processing of mail for which billing had been bypassed, the BMEU management believed there was a problem as of September 2004, and began an investigation. In fact, Mr. Sargent did not start taking Postage Statements and failing to make entries until mid-March, a date reflected in his accounting. Therefore, suspicion focused on Mr. Sargent a mere two weeks after he began taking Postage Statements. Therefore, Mr. Sargent's actions - although limited to a relatively few occurrences at that point - were relatively quickly detected and attributed to him by his supervisors.  At that point, Mr. Sargent had only bypassed billing for eight mailings.

### Analysis

A USPS employee, Mr. Sargent did not engage in the theft of undelivered mail, to which an abuse of public trust adjustment would apply. Nor was he a supervisor or a manager with the Postal Service, which also might suggest the adjustment is appropriate. A person is in a position of public trust only if he had "'substantial discretionary judgment that is ordinarily given considerable deference.'quoting the commentary, Note 1, to USSG 3B1.3. regarding "professional or managerial discretion." Id.   Compare United States v. Peyton, 353 F.3d 1080, 1090 (9th Cir. 2003) in which the adjustment was applied to a supervisor who had managerial discretion to access a secured roster

8

listing the names and social security numbers of postal employees, which he exploited to commit fraud in their names.

There is no question that Mr. Sargent used his position in the BMEU to commit the theft of Postage Statements. But that circumstance does not in and of itself satisfy the criteria for the adjustment. Mr. Sargent's duties with respect to the receipt and maintenance of Postage Statements were not reserved to him as a Technician, and they were wholly non-discretionary in nature.

Anyone in Mr. Sargent's unit could have received, taken or destroyed or lost Postage Statements and bypassed the use of PostalOne! Accounting. In fact, they apparently did. The BMEU management reported problems with by-passed mail in the past. It's a problem not limited to the Anchorage BMEU, and has been the subject of national USPS study.

Mr. Sargent's own actions were detected soon after he began, and reported to the Postal Inspectors. Therefore his crimes were easily detectible.

**Para. 55**

Post Booker, the court should provide Mr. Sargent with a sentencing benefit reflecting the extent of his acceptance of responsibility. In this case, Mr. Sargent timely notified the government that he wished to waive a jury and have a stipulated facts trial on but one quasi-legal issue. Mr. Sargent drafted a set of proposed stipulations and informed the government that his counsel was available to do all the leg work necessary to finalize a stipulated facts presentation. The government nevertheless chose to go to trial. Although this may be the government's prerogative, it cannot be said that Mr. Sargent's own actions disqualified him from the full scope of the downward adjustment.

**Para. 62**

Mr. Sargent was not represented by counsel, but represented himself.

**(Continued on next page)**

9

**Para. 65**

It should be noted that Mr. Sargent, a licensed firearms dealer, himself arranged for APD to take his entire inventory of guns out of his home and into "safekeeping" for the pendency of the case. Following his release, Mr. Sargent himself initiated contact with ATF's Melanie Shea for the purpose of clarifying what he could and couldn't do with respect to finalizing gun transactions already underway, and disposing of his firearms in compliance with federal law.

This meeting came about because Mr. Sargent had been released, his firearms inventory had been voluntarily placed into safekeeping with APD, and Mr. Sargent wanted to finalize all pending firearms transactions and make arrangements for another licensed firearms dealer to take over his inventory.

Present at this meeting was Bruce Johnson, AFPD investigator, and Gary Eichorn, the Systems Administrator for the Federal Defender. Both of these individuals have read over and agree as to the following responses and account by Mr. Sargent.

> *"Sargent was asked if transfer forms were filed for the NFA firearms transfers, and he responded, "No.""*

This single-word answer attributed to Mr. Sargent is misleading, because Mr. Sargent spent considerable time in this meeting explaining that these firearms were not "transferred", but had been entrusted to Mr. Sargent's safekeeping, pursuant to procedures outlined in the BATFE 2005 edition of the Federal Firearms Regulations Reference Guide (section M22, page 189).

> *"Sargent also said that he understood their (Sealock's and Gammarano's) firearms should have been locked away, but that he had not gotten around to it and has had full access to the guns throughout the time they have been in his possession"*

Mr. Sargent did not make this statement. He commented, " In fact, Ms. Shea was advised that trigger housing locks had been fitted to the NFA firearms specifically to preclude my having access." Both Mr. Johnson and Mr. Eichorn remember that Mr. Sargent said he did not have the keys for these locks. Ms. Shea and Mr. Sargent spent several minutes discussing the viability of such an arrangement as opposed to a padlocked container or locked room in complying with the spirit and intent of the FFRRC section reference above.

> *"Sargent also said that the firearms he was keeping for other people were not logged in to his A&D record book"*

Mr. Sargent did not make this statement. Mr. Sargent showed Ms. Shea his "A&D record book" (the acquisitions and dispositions log each licensee is required to maintain), in which he pointed out that all of these client firearms were logged and differentiated for identification with unique background shading.
.

10

**Para. 79**

Mr. Sargent came to work at 3:00 p.m. and left at 1130 p.m.  He worked alongside another Bulk Mail Clerk (Sun Heo), who received overtime, most evenings until 7:30 p.m. Beginning in May or June 2005,  Virgil Davis was employed and also worked in the BMEU until 7:30 p.m

**Para. 84 et seq**

In spring 2006, Clitheroe Center had assessed Mr. Sargent and recommended out-patient treatment for substance abuse. Mr. Sargent enrolled in and completed the program at RITE, Inc. Attached are the certificate and paperwork reflecting Mr. Sargent's course of treatment.

**Para. 105**

Should be updated with Mr. Sargent's July 2006 spreadsheet. (See next page – let me know if you can't read it)

**Para. 106**

There are changes to be noted.

Under asset category:

| | |
|---|---|
| Credit Union 1 / Savings - | $ 13,028.88 |
| Credit Union 1 / Checking - | $   985.14 |
| CSRS Retirement Refund - | (received and dispersed) |
| US Gov't Thrift Savings Plan - | (received and dispersed) |
| Merrill Lynch IRA  - | $ 17,500.00 |

The debt category under the net worth statement has been modifed:

| | |
|---|---|
| credit card debt - | $ 10,045.54 (abt $58,000 paid off) |
| auto loan - | (paid off) |

11

| CARD TYPE | ISSUER | NUMBER | EXP | CURRENT BALANCE | CREDIT AVAILABLE | CREDIT LIMIT | LP AMT | LP DATE | 800/888^ CONTACT# | VER # | PIN | ADJ - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VISA | Capital One - Gold | +388-6417-7681-5008 | 9/06 | $0.00 | $1,000 | $1,000 | $669 | 6/2 | 903-3637 | 251 | | |
| VISA | Capital One - Silver | +121-7+11+0085-1056 | 07/09 | $0.00 | $900.00 | $900 | $637 | 5/19 | 608-5227 | 391 | 3888 | |
| VISA | Capital One - SPMO | +802-1315-20+1-9693 | 07/09 | $13.03 | $1,486.97 | $1,500 | $1,463 | 6/3 | 867-090+ | 11+ | +1+1 | |
| VISA | Capital One - Reg | +121-7+156+19-0651 | 08/09 | $0.00 | $1,000.00 | $1,000 | $381 | 6/2 | 903-3637 | 1+1 | 8888 | |
| VISA | Credit Union One | ++26-9800-2209-6060 | 07/07 | $0.00 | $5,000.00 | $5,000 | $4,696 | 5/6 | 682-6075 | 766 | | |
| VISA | Providian - Platinum | +185-5110-0161-8201 | 05/07 | $39.90 | $3,978.00 | $4,018 | $488 | 6/26 | 273-2273^ | 333 | 8+22 | |
| VISA | Providian - Gold | +465-6805-0089-76+5 | 02/07 | $0.00 | $7,649.00 | $7,649 | $+5 | 6/26 | 366-0011 | 126 | 2369 | |
| VISA | Merrick Bank | +120-6130-2701-0179 | 04/06 | $94.10 | $2,905.00 | $3,000 | $1,300 | 6/27 | 253-2322 | +1+ | | |
| VISA | Capital One - Enhn | +791-2+20-3068-8850 | 08/09 | $9.95 | $1,490.05 | $1,500 | $10 | 6/3 | 867-090+ | 832 | ++++ | |
| VISA | Capital One - Enhn | +115-0721-2985-8356 | 02/09 | $0.00 | $1,500.00 | $1,500 | $67 | 6/15 | 867-090+ | 395 | 7666 | |
| VISA | Chase | +266-8++1-2000-3290 | 04/08 | $57.25 | $2,++2.00 | $2,500 | $89 | 6/15 | ++1-7681 | 237 | 5296 | |
| VISA | Bank One - USPS | +266-8+10-2253-+695 | 12/08 | $808.65 | $7,691.00 | $8,500 | $5,83+ | 6/15 | 305-+016^ | 547 | 8888 | |
| VISA | BOA - AK Airlines | +888-6032-2623-2973 | 04/07 | $3,626.77 | $3,373.23 | $7,000 | $2,000 | 6/26 | 552-7302 | 899 | +015 | |
| M/C | APWU | 5+80+200-2968-7-28+ | 06/08 | $0.00 | $3,000.00 | $3,000 | $376 | 5/21 | 622-2580 | 493 | 3332 | |
| M/C | Advanta Platinum | 558+1893-0218-2161 | 05/08 | $0.00 | $7,500.00 | $7,500 | $2,511 | 6/26 | 705-7295 | 01+ | | |
| M/C | Pulaski Bank | 5+11-8260-0100-3318 | 06/07 | $5,369.9+ | $2,630.00 | $8,000 | $1,000 | 6/30 | 765-0853 | 5+0 | | |
| M/C | Providian | 95+2-8522-0053-7817 | 06/07 | $0.00 | $2,971.00 | $2,971 | $+ | 2/9 | 366-0011 | 962 | 2248 | |
| M/C | Capital One - Gold | 5291-151+-+786-5377 | 07/09 | $0.00 | $1,200.00 | $1,200 | $1,095 | 6/2 | 903-3637 | 09+ | 8888 | |
| M/C | Orchard Bank | 5++0-+500-6786-7-2+7 | 09/08 | $0.00 | $1,500.00 | $1,500 | $32 | 6/27 | n/a | 621 | | |
| M/C | First Premier | 5178-0070-9751-9696 | 05/08 | $0.00 | $500.00 | $500 | $106 | 6/26 | 987-5521 | 939 | | |
| M/C | Household | 5+88-9750-1619-7827 | 11/06 | $25.95 | $774.00 | $800 | $26 | 6/+ | n/a | 619 | | |
| DISCVR | Discover Platinum | 6011-0006-0077-9924 | 01/08 | $0.00 | $8,500.00 | $8,500 | $1,922 | 6/26 | 347-2683 | 186 | 8888 | |
| AM EX | AMEX Business | 37 15-383189-91007 | 01/07 | $0.00 | OPEN | OPEN | $150 | 5/20 | +92-33++ | 080 | | |
| GAS | Chevron | 782-523-3+3-56 | 10/07 | $0.00 | $2,000.00 | $2,000 | $+0 | 3/23 | 2+3-8766 | n/a | | |
| | | totals (as of 12 July 06) | | $10,045.54 | $70,990.25 | $81,038 | $25,711 | | | | | |

**Para. 123**

No fine should be imposed in light of the special assessments to be imposed ($700), his unemployed status, the possibility of incarceration, and - as a convicted felon- his limited prospects for employment.

**Para. 131**

Mr. Sargent did create and maintain a personal record of all information provided in the stolen Postage Statement by postal customers. He did this because he believed his actions would be eventually detected, he would be called on the proverbial carpet, and he wanted to be able to show the USPS that his actions had neither interfered with the mail nor involved the taking of any funds.

This personal record logged: the date of the mailing, bulk mail permit number, the name of the customer, the class of mail, the number of pieces, and the postage revenue required. The record also showed if the by-passed nature of the mail had been "reversed" and revenue accounted for. These detailed records have been used by the Postal Inspector to identify and contact the customers

12

United States v. Sargent
Case No. 3:05-cr-0118-RRB

involved and obtain payment the vendors owed for the postage they utilized.

After a long time of sobriety and abstinence, in 2005, Mr. Sargent faltered, He used Valium that he obtained on the Internet to deal with his diifculties in sleeping and drank Bailey's Irish, resisting the urge to use anything 'stronger.'  Although an intelligent man, Mr. Sargent never imagined that the sanction for his misconduct would this serious, although he certainly recognized that he risked his continued employment for such misconduct. At the time and for some while, Mr. Sargent rationalized his acts, thinking that what he did would ultimately bring about some institutional change. Post arrest and sober and abstinent again, Mr. Sargent certainly understands how distorted his thinking was, and ultimately how completely self-destructive his actions were.

Certainl, Mr. Sargent needs ongoing support to maintain his sobriety and mental health counseling.

It is proposed that Mr. Sargent should receive a probationary term of five years with a condition for six  months in a halfway house. This sentence would be  appropriate based on the relevant 18 USC 3553(a) factors.

The nature and circumstances of the offense: a property crime, from which no financial gain was expected or realized. The defendant fully expected his actions would be discovered, and fully documented his misconduct. The defendant cooperated when confronted.

The history and characteristics of the defendant: a long-term public employee, with a personal history significant for substance abuse and depression. Letters from his friends and family testifying to many positive attributes on Mr. Sargent's part, suggest that isolation and anti-social nature of the incarceration experience would be counter-productive.

The felony convictions, the disabilities attendant, the proposed maximum term of probation, and halfway house time, together and adequately reflect  the seriousness of the offense and afford adequate deterrence to criminal conduct

The maximum probationary term of five years –x and the condition of disclosure to prospective employers  - will best provide protection of the public from any further crimes.

The probationary term will also allow the probation office to monitor the defendant via testing and other means to determine  if the defendant has resorted to alcohol or drug testing. Additionally, Mr. Sargent may be referred for a psychiatric evaluation to determine the need for mental health treatment and/or medication, and such treatment may be ordered pursuant to the court's order.

A lengthy probationary term is well suited to this defendant because it will best provide the defendant with the kind of correction, and treatment, that he requires.