Mary C. Geddes
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska 99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>  vs.<br><br>MICHAEL DAVID SARGENT,<br><br>             Defendant. | Case No. 3:05-cr-0118-RRB<br><br>**DEFENDANT'S<br>SENTENCING MEMORANDUM** |

*I.     INTRODUCTION*

Defendant, Michael David Sargent, by and through counsel Mary C. Geddes, Assistant Federal Defender, files this memorandum in anticipation of the sentencing hearing scheduled for Tuesday, August 8, 2006, before this honorable court. The undersigned does presently anticipate that an evidentiary hearing will be required on several disputed issues, and thus a motion for an evidentiary hearing has been separately filed as required by Local Rule 32.1(f).

II.    *FACTORS TO BE CONSIDERED AND PURPOSES APPLIED UNDER THE SENTENCING REFORM ACT*

*United States v. Booker* held that district courts are no longer required to follow the United States Sentencing Guidelines ("Guidelines"), when making sentencing decisions, although "the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals."  543 U.S. 220, 259, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005) (*citing* 18 U.S.C.A. § 3553(a) (Supp. 2004)).

Section 3553(a) specifies the factors to be considered in imposing a sentence.

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider –

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

In accordance with the requisite statutory analysis, then, this court considers:  the offense, the offender, the need for the sentence; in effect, to reflect community norms, to afford adequate deterrence to criminal conduct, to protect the public from recidivism by the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner. Furthermore, the sentence should be "no greater than necessary" to achieve the purposes stated in the Act.

As part of the court's consideration of the kinds of sentences available, the court considers what sentence would be formulated using the Guidelines.

III.    THE OFFENDER

Because Mr. Sargent stipulated to a court trial on but one issue, much of the nature and circumstances of the offenses is well known to the sentencing court. However, at the time of the verdicts and the court's written findings, the court knew little about Mr. Sargent because he did not seek to improperly exploit the vehicle of the court trial on the limited issue of "value."

Mr. Sargent was an employee of the United States Postal Service for twenty-nine years. He had worked at the Business Mail Entry Unit (BMEU) for sixteen years. He had hoped for advancement and applied for the new Business Mail Analyst position. The woman who was promoted, Uni Han-Norton, had less experience than Mr. Sargent, and occasionally struggled with expressing herself fluently in English. Mr. Sargent could not understand why he would be passed over, other than because of his union stewardship/representation or his non-minority status. Mr. Sargent was perhaps even more incredulous that the BMEU management claimed that he was not needed for overtime in 2005, given that he and Ms. Han-Norton had together logged approximately 1700 hours overtime during the previous year, and Ms. Han-Norton's position was now empty. After he complained about these management decisions, and although he had never been disciplined before 2005, Mr. Sargent now found himself called on the carpet repeatedly in early 2006, after his return from leave in mid-February.

Mr. Sargent, then 47 years old and a high school graduate who had spent nearly all of his working life with the USPS, read these administrative actions as personal rejections, and he took them terribly hard. Mr. Sargent concluded his lengthy service was no longer valued. He stopped speaking to Ms. Han-Norton, even though – or perhaps because – they had been close personal friends. He was anxious and unable to sleep, and he resorted to Internet mail-order medications such as Valium for relief. And, after ten years of sobriety, Mr. Sargent began drinking again. His judgment increasingly obscured by stress and substances, rather than simply quitting, it occurred to Mr. Sargent that he could "show" BMEU management how much they needed him, especially for the reconciling of the cash deposits with PostalOne! activity. He waited to be caught. He was astonished and confused when he was not, for a long time. Having committed himself to a wrongful course of action, he did not know what to do other than compulsively continue, and wait for the other shoe to drop.

It is notable that Mr. Sargent's actions did not involve the destruction of mail or any impediment to its delivery. The safeguarding and delivery of the mail is the principal purpose of the Postal Service, and one that Mr. Sargent, a longtime employee, held sacrosanct. Certainly, it is also significant that, unlike most crimes by postal employees, these were never intended by Mr. Sargent to realize any financial benefit.

Outside of the Post Office, according to friends and family who have written the court, Mr. Sargent is known to be kind, unselfish, sensitive, generous, and caring. But, for whatever reason, inside the working environment of the BMEU, he was so stressed and depressed that he resorted to what can be described as a form of suicide. His actions obliterated a lengthy and commendable record of public service, decimated his personal finances, and cost him his avocation

4

and associations because he will be a felon.  A healthy, rational person would have quit a difficult work environment, but Mr. Sargent was not.

At no time since this case commenced has Mr. Sargent ever suggested that he was justified in his conduct or thinking.[1]  Since that time, Mr. Sargent has only acted in a manner consistent with his taking responsibility and acknowledging wrongdoing, in the following ways:

• he waived counsel and gave oral and written admissions at the time of his arrest;

• he assisted U.S. Postal Inspectors with their interpretation of his computer files, which were inculpatory;

• he voluntarily resigned from the Postal Service and ended outstanding employee grievances;

• he immediately arranged for the safekeeping of his firearms inventory with law enforcement, and has been working hard to wrap-up all the paperwork related to his firearms business;

• he waived jury trial;

• he unsuccessfully sought a stipulated-facts trial;

• he limited the disputed issues to one quasi-legal question and presented but one expert witness;

• he has been fully compliant with all bail conditions, including a condition for out-patient treatment;

_____

[1] Unfortunately, the government continues to unnecessarily vilify Mr. Sargent at the expense of the record.  In its sentencing memorandum, the government insists that

> Sargent continues to minimize his motive for his crimes and their impact on the USPS.  He characterizes it as "actually doing the Post Office a favor by exposing a weakness in the accounting system."

Gov't Sent. Mem. at 5.  Not only does the government not bother to inform this court that the source of this quotation was Dr. Ohlson, not Mr. Sargent, but the quotation is taken out of context.  *See* Dr. Ohlson's report, listing of psychological factors, at (2).  Mr. Sargent was evaluated by Dr. Ohlson, whose agenda was to help the court understand why Mr. Sargent thought and acted as he did *at the time of the offense*.

- letters from friends and family report his remorse, his acknowledgment of the seriousness of this offense; and do not suggest anything other than his personal responsibility.

Furthermore, at no time has Mr. Sargent denied the inevitable prospect of his felony conviction. More than most people, the felony conviction has immediate and concrete consequences for him; it has meant the end of an avocation which he really enjoyed, and the end of many formal and active associations. Because of bail conditions, Mr. Sargent also has been hamstrung in disposing of his firearms and so will suffer financial losses related to his inability to sell that inventory.

The government has said that a lengthy sentence of incarceration should be ordered for Mr. Sargent, who has never been incarcerated before, because it would reflect the seriousness of his offense and deter others. Gov't Sentencing Mem. at 7. However, as the foregoing illustrates, it is clear Mr. Sargent fully appreciates the seriousness of his crimes, and his future status as a convicted felon. A sentence of incarceration is not needed to achieve that goal. Furthermore, as this "theft" crime is so unusual and has so atypical a motivation, general deterrence is not a significant concern.

According to the psychological evaluation conducted by Dr. Ron Ohlson, the following psychological factors help explain the how and why of Mr. Sargent's strange offenses.

1) [Mr. Sargent's] use of benzodiazapines and alcohol may have blunted his fear of the consequences of his action.

2) The denial and rationalization that is so common in alcoholics also served to negate the thought that his action was illegal and could be harmful to himself or the Post Office. In fact, his failure to assess the wrongfulness of his act led him to believe that he was actually doing the Post Office a favor by exposing a weakness in the accounting system. Although he expected to be called to account, he was not surprised by his arrest because he expected a reprimand, but he was shocked by how seriously the offense was being taken.

3) His obsessive-compulsive thinking locked him into a single solution to his grievance. He has exhibited this cingulate brain function ever since he was a small child. The energy of the brain becomes focused on the central gyrus, reducing access to both cerebral hemispheres. This results in cognitive inflexibility, trouble shifting attention, persistence in negative thinking and behaviors, worrying, holding grudges, oppositional behavior, need for sameness and trouble with change. This condition is alleviated with appropriate antidepressant medication, but he was not taking appropriate medication at the time of the offense.

Given Dr. Ohlson's findings that Mike Sargent is at low-risk of re-offending and not likely to express anger or frustration in a violent manner, and given that deterrence of others is not a significant sentencing concern where the conduct involved is unlikely to be repeated by anyone else, the sentencing court must nevertheless fashion a sentence which provides sufficient supervision of Mr. Sargent.. That sentence would be a probationary term of years.

Probation conditions would mandate the notification of potential employers of Mr. Sargent's past conduct; thus, this sentence will serve to protect the public. Probation conditions can also ensure the defendant receives the "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3663(2)(D), which also protects the public. Indeed, as Dr. Ohlson has noted in his report, incarceration may not provide the best sentencing option because:

- "Mr. Sargent has not developed an alternative to alcohol or drugs for dealing with his emotional, physical and psychological distress and needs an intensive, effective program for developing a new alternative. The accountability of probationary requirements can be helpful in establishing a pattern for permanent sobriety."

- "His sleep disorder precedes his use of alcohol and drugs. He needs to undergo a medically supervised sleep study in order to develop an effective treatment for this disorder. Placement in a noisy, crowded prison facility will jeopardize his ability to overcome the sleep disorder, and may make it even worse."

- "He will need ongoing psychiatric treatment with effective antidepressant medication to alleviate his obsessive-compulsive, overfocus and depressive issues. He needs to commit

7

to a long-term therapy relationship in which he will overcome his tendency to self-educate and self-medicate rather than self-disclose in a helping relationship."

• Mr. Sargent may require job re-training.

Post-*Booker*, this court has the discretion to determine the appropriate sentence for this offender. A probationary sentence would "be no greater than necessary," to achieve the requisite purposes of the Sentencing Reform Act. The range indicated by the Sentencing Guidelines is inapposite here because the offense involved actions and motivations "outside the heartland" of USPS theft cases, and a sentence of incarceration would work against the legislated sentencing purposes.

IV.    *GUIDELINE AND PSR ISSUES (EVIDENTIARY HEARING OR CORRECTION REQUIRED)*

Because the court is nevertheless required to determine what Guideline adjustments would apply, *United States v. Staten*, 450 F.3d 385, 388 (9th Cir. 2006)., the remainder of the memorandum will address those Guideline and PSR issues.

Where there are disputes pertaining to the PSR, the court can choose to correct or strike the disputed item or hold a hearing.

A.    *Para. 12b:  Error in "The Offense Conduct"*

The PSR states:  ". . .  The customer "trust account" is a lot like an escrow account, as it allows advance payments (deposits) by a business mail customer to be held until designated for use . . . ."

However, the customer "trust account" is not an escrow account, but an accounting designation allowing for advance payments by a business mail customer.  The USPS does not

physically segregate these funds, which is the very nature of escrow, that funds are held in a discrete account. The funds are paid into the Treasury.

B.    *Para. 12c:  Error in "The Offense Conduct"*

The PSR states:  ". . . however, the program does have the ability to move funds, e.g. from one account to another, in initiating a refund process, or allowing for annual fee payments."

This is inaccurate. The testimony at trial was that PostalOne! was/is a stand-alone system, not integrated with the cash accounting system. That is why the BMEU techs and clerks must independently key in receipts (from the USPS cashier) in order to maintain their records of debits.

C.    *Para. 16:  Error in Description of "The Offense Conduct"*

The PSR writer indicated reliance on records to show Mr. Sargent's leave ended in mid-January. Mr. Sargent believes his leave ended on February 14.

D.    *Para. 19:  Error in Description of "The Offense Conduct"*

The PSR stated:  "The supervisor advised that he had spoken with the defendant eight or nine times about billing the wrong trust account."

The supervisor involved was Art Golez, and Mr. Sargent disputes that there were "eight or nine" conversations about this subject matter. In 2005, Mr. Sargent once mistakenly billed the wrong account, and the error was corrected.

E.    *Para. 49:  Error in Enhancement for Abuse of Position of Trust*

This error impacts the Guideline sentence determination, as it concerns a two-level enhancement of the offense level.

Mr. Sargent was not a postmaster or a sole employee. While it is undisputed that Mr. Sargent was alone for the last part of his shift and that he took home many of the stolen Postage Statements from the BMEU, Mr. Sargent and his work was nevertheless supervised, as the use of video surveillance to document his offense amply demonstrated. Furthermore, Mr. Sargent did not have supervisory responsibility, or a leadership role with respect to the mail handler. The mail handler belonged to another union, and was himself independently responsible for ensuring that any mail leaving the unit had a Form 3607 attached to it. Discovery provided in this case showed that, in 2005, the BMEU mail handler participated in a review of proper mail-handling procedures. Therefore he was not in the dark as to his own responsibilities.

Mr. Sargent previously filed a lengthy factual recital and argument concerning this disputed enhancement. He does not know whether the government disputes this recitation, but this account was not integrated into the final PSR. Therefore, his objections are reiterated below, at pages 10-18.

*(1)     Introduction*

The job description for a Bulk Mail Technician does indeed specify that a Technician may serve as a team leader or one or more employees (a reference to Bulk Mail Clerks) and may work alone for 75 percent of the time. However, the determination of whether the adjustment is applicable does not rest upon a job description; the analysis is a functional one, concerns itself with the acts constituting the offense, and evaluates whether the offense involved the exploitation of discretionary authority.

The adjustment is not appropriate here.

10

Although he was a Bulk Mail Technician, his <u>offenses</u> had to do with those duties shared by Technicians and Bulk Mail Clerks. Both employees receive Postage Statements from customers. Both use the PostalOne! database to track balances, and to input new mail activity. Clerks and Technicians share the principal function of Mail Acceptance. They are responsible for the physical labor of mail handling and the data entry involved in Mail Acceptance.

Furthermore, Mr. Sargent was not unsupervised, nor was he entrusted with managerial and discretionary authority. Finally, the reality was that, as least as of February 14, 2005, and throughout the reminder of the year until the time of his arrest, Mr. Sargent was closely watched by his BMEU supervisors and trusted with very little.

*(2)    The BMEU positions were classified into "craft" and "supervisory"*

During the relevant time frame, Mr. Sargent was a Bulk Mail Technician in the BMEU. Sun Heo was a Bulk Mail Clerk. Beginning in late May or June, Virgil Davis began working as another Bulk Mail Clerk.[2] Bulk Mail Clerks and Technicians are similarly classified, paid, and surveilled.

Clerks and Technicians are classified as "craft employees" and are in the same bargaining unit. The applicable pay scales peg a Clerk as Level 5, and a Technician as Level 6. The salary difference between the two craft positions is about 30 cents an hour, amounting to approximately $1,200 to $1,300 per year. Craft employees are required to literally "clock in" and "clock out" for all time, including lunch time. Both positions require the physical movement of mail; indeed, a threshold requirement for employment as either Clerk or Technician is that the

---

[2] The mail handler who removed the mail from the BMEU was not a BMEU employee. The mail handler was supervised by another mail processing employee.

individual must have the ability to lift 70 pounds. Although a Bulk Mail Technician may have a greater variety of responsibilities than a Clerk does, the "Mail Acceptance" function shared by both Clerk and Technician has priority over everything else.

Mr. Sargent's crimes were his thefts of Postage Statements from the BMEU. Those were crimes that could have been committed by anyone in the unit. The Postage Statements contained the Bulk Mail Customers' estimate of the cost of the bulk mailing brought to the USPS for mailing. Anyone in the unit was in a position to receive Postage Statements from customers. Any BMEU employee was in the same position as Mr. Sargent to destroy or take Postage Statements.

The BMEU had other positions which are categorized as within the "supervisory or non-bargaining personnel unit." Those positions included the BMEU Analyst, filled in December 2004 by Uni Han-Norton, the BMEU Supervisor, Art Golez, and the BMEU Manager, Beverly Christie. A different pay scale applies to these executive and administrative positions. The Analyst position is pegged at level 15; the Supervisor as either 17/18, and the Manager as 20.

(3)    *The BMEU management did not "trust" Mr. Sargent*

In 2004, Mr. Sargent had aggressively represented his bargaining unit (Uni Han Norton, Sun Heo, and himself) in limiting management's use of an employee from another unit for overtime BMEU work. It was agreed that Mr. Strong would only be used if his assistance in the BMEU did not effectively displace another BMEU employee who would otherwise be entitled to an overtime opportunity. This agreement was signed by Beverly Christie on April 14, 2004.

However, the settlement failed, as the Union said the Agency had failed to adhere to the agreement. In October 2004, Mr. Sargent therefore resumed the prosecution of the grievance with an appeal. The appellate complaint was that overtime had been denied Mr. Sargent and others

even though the increased volume of mailings in calendar year 2004 was 20 percent above normal due to election activity, and the level of craft employee staff was at 75 percent. The appeal was supported by correspondence from Sargent, Han-Norton, and Heo. Ms. Han-Norton complained that

> Managements [sic] are violating a grievance that settled on April 14, 2004, by not scheduling BME employee to cover the BME function, Managements were and still scheduling Mailing Requirement clerk (Eddie Strong) to cover the breaks, lunch, leave, and eve during normal work hour in BME. Failed and keep failing to schedule knowledgeable BME employee to cover the BME work by bring Mailing Requirement clerk who isn't comfortable with new Postal One program.

In December 2004, there were other developments which increased the tension within the BMEU. The overtime grievance was still in litigation, and Mr. Sargent was notified that he had not been selected for the position of BMEU Analyst. Mr. Sargent immediately and formally complained, alleging that a less-qualified person had been hired (Bulk Mail Clerk Uni Han-Norton). He said he had been discriminated against because of his protected activity as a union representative and/or because of his race or gender.

> (4)  *During 2005, management's supervision of Mr. Sargent was particularly intense*

On December 17, 2004, two days after filing his EEO complaint, Mr Sargent received, from his supervisor Art Golez, a formal "Letter of Warning for Failure to Follow Instructions." The Warning cited Mr. Sargent's failure to take his allotted lunch. Mr. Sargent complained that other individuals similarly situated were not disciplined and that skipping lunch was a long-standing practice by he and Ms. Han-Norton, because of the volume of work in the unit. Mr. Sargent said that he had skipped lunch 149 times that year, with no previously imposed sanction. Mr. Golez defined it as an overtime issue.

Mr Sargent complained that the disciplinary letter was further evidence of discrimination.  He said that no other employee had ever been disciplined by Golez, even though Han-Norton had also worked through lunches in 2004 and Sun Heo had once poked him (Sargent) repeatedly in the chest during an argument in 1994.  Mr. Sargent alleged that the letter was retaliation for the filing of the EEO complaint, and other representative (and legally protected) actions filed by Mr. Sargent on behalf of the bargaining unit.

Mr. Sargent had been an employee of the Agency for the preceding 29 years (the immediately preceding 16 years in the same work center) without prior disciplinary action.  In early January, Mr. Sargent began five weeks of previously-scheduled leave (arranged in August).  During his leave, he corresponded with the BMEU manager about the climate in the BMEU and his worries concerning Mr. Golez.  He also expressed concern that due to Ms. Han-Norton's promotion, the BMEU staffing would now fall to 50 percent of the staffing needs, and that he was expected to carry the voluminous workload without incurring overtime.

On his return to the BMEU, on February 14, supervisor Golez arranged daily meetings with Sargent.  Sargent complained to Christie that these were "interrogations," probably intended to force him out of his job.

In a letter dated February 18, Mr. Sargent complained to Ms. Christie that:

[H]e presented me with a varied "laundry list" of my perceived shortcomings, errors, and deviations from his instructions – some of which dated back as far as mid-December of 2004.  I have attempted to comply with his often contradictory instructions while making what I considered my best effort to provide for timely clearance of mail, although being limited to an eight hour shift.  My coworker, Sun Heo is presently permitted to work ten hours . . .; as we are both aware, the BMEU is currently operating with a 50% complement due to unfilled vacancies.  I expressed my concerns that Art was acting in a vindictive and intimidating manner in retaliation for the concurrent grievance, EEO, and NLRB charges that I have been compelled

14

to file regarding the disciplinary letter that he issued me on 17 December 1994.  I further assumed that his daily "private meetings" with me were a deliberate attempt on his part to elicit a response that would enable him to impose further discipline that might lead to termination of my employment with the Postal Service.

Throughout February and into March, with even one less BMEU Mail Acceptance position due to Ms. Han-Norton's promotion, the tension between Golez and Sargent escalated.  On March 9, 2005, Sargent was warned about a "failure to adhere to the employee vehicle parking policy**."**  It was in mid-March that Mr. Sargent began by-passing mail, i.e. forwarding mail for processing without doing the keypunching required for PostalOne! accounting.

Mr. Sargent continued to worry about getting the mail out <u>and</u> getting fairly paid for the extra work involved, given the reduction of staffing and the use of temporary employees.  He believed that Golez had never understood BMEU operations and therefore could not appreciate the length of time.  Golez, on the other hand, wanted to avoid the overtime that, during 2004, had nearly doubled the annual salaries due Han-Norton and Sargent.  Golez forbid Sargent to work overtime, but only arranged for partial staffing.

In a letter to Manager Christie in late March 2005, Mr. Sargent described the "keying" and "weighing" work still remaining to be done after other, temporary BMEU staff had departed for the day, and the disparity between the actual volume and the volume projected for this period by the USPS.  Mr. Sargent also described Golez' latest barrage of criticism following Sargent's efforts to balance his demands.

The tension did not abate, but rather accelerated, over time, with Mr. Sargent getting called on the carpet again and again.  On March 30, 2005, Mr. Sargent was disciplined, essentially for writing his March 25 letter to Ms. Christie, after work hours and at the BMEU, i.e. for

(1) utilizing USPS equipment for "union business," and (2) being on postal premises in a non-paid status.

On May 25, 2005, he was cited for a failure to follow instructions regarding holding standard eligible mail for following day for verification.

On July 11, 2005, he was disciplined for his failure to follow instructions for permitting Friday night clearance of time sensitive material (Alaska Courts of Appeals Opinions). On July 15, 2005, he was investigated – and later cleared – for the unsolicited receipt of a two page FAX transmission. On August 3, 2005, he received another Letter of Warning: Failure to Follow Instructions (2 specifications). On August 19, there was another investigative interview concerning the unsolicited receipt of a one page FAX transmission on August 10.

Even without the special attention he personally received from his supervisors in 2005, it cannot reasonably be said that Mr. Sargent was not subject to much supervision. Like others in his collective bargaining unit, Mr. Sargent was subject to contract conditions that waived his privacy rights in the workplace. Additionally, section 232.1of Title 39 of the Code of Federal Regulations provides that all purses, briefcases, backpacks brought into and removed from a mail facility are subject to inspection upon demand. His supervisors had the access to and the right to conduct searches of his desk, his computer, his vehicle (when parked at work) and his briefcase when leaving the Post Office premises. Surveillance cameras were also mounted in the BMEU, and are operational at least some of the time.

With respect to the processing of mail for which billing had been bypassed, the BMEU management believed there was a problem as of September 2004, and began an investigation. In fact, Mr. Sargent did not start taking Postage Statements and failing to make entries until mid-

March, a date reflected in his accounting.  Therefore, suspicion focused on Mr. Sargent a mere two weeks after he began taking Postage Statements.  Therefore, Mr. Sargent's actions – although limited to a relatively few occurrences at that point – were relatively quickly detected and attributed to him by his supervisors.  At that point, Mr. Sargent had only bypassed billing for eight mailings.

> (5)    *Analysis*

A USPS employee, Mr. Sargent did not engage in the theft of undelivered mail, to which an abuse of public trust adjustment would apply.  Nor was he a supervisor or a manager with the Postal Service, or a post master in a remote location, which also might suggest the adjustment is appropriate.  A person is in a position of public trust only if he had "substantial discretionary judgment that is ordinarily given considerable deference."  *Quoting* the commentary, Note 1, to USSG 3B1.3. regarding "professional or managerial discretion."  *Id.*  *Compare United States v. Peyton*, 353 F.3d 1080, 1090 (9th Cir.2001), in which the adjustment was applied to a supervisor who had managerial discretion to access a secured roster listing the names and social security numbers of postal employees, which he exploited to commit fraud in their names.

There is no question that Mr. Sargent used his position in the BMEU to commit the theft of Postage Statements.  But that circumstance does not in and of itself satisfy the criteria for the adjustment.  Mr. Sargent's duties with respect to the receipt and maintenance of Postage Statements were not reserved to him as a Technician, and they were wholly non-discretionary in nature.

Anyone in Mr. Sargent's unit could have received, taken, or destroyed or lost Postage Statements and bypassed the use of PostalOne! accounting.  In fact, they apparently did.  The BMEU

management reported problems with by-passed mail in the past. It is a problem not limited to the Anchorage BMEU, and has been the subject of national USPS study.

Mr. Sargent's own actions were detected soon after he began, and reported to the Postal Inspectors. Therefore, his crimes were easily detectible.

F.    *Para. 65a:  Error in Inclusion of "Pending Charges"*

Mr. Sargent asks that this paragraph be struck; no charges have been filed nor are anticipated.

The sixth paragraph (beginning with "Sargent also said") should have been in italics as it was also a quote from the information in the draft PSR.

As reflected in his objections to the draft PSR, Mr. Sargent disputes that he has violated any federal statutes. Since the time the "final PSR" was distributed, the government has decided not to prosecute Mr. Sargent. Therefore, this section should be deleted. Maintaining this information in the draft PSR will erroneously influence the determination of Mr. Sargent's custody level.

G.    *Para. 40, 128: Restitution Notice*

Mr. Sargent does have an outstanding legal objection to restitution, as he believes it is not statutorily authorized (*see* Section V). That objection may be resolved in this hearing.

Regardless, Mr. Sargent had requested (in a separate pleading) that the court's determination of restitution be postponed until Mr. Sargent has a sufficient opportunity to review, investigate, and brief the matters to the court. The government yesterday filed a letter from the USPS and a specific accounting of amounts due for bypassed mail. Based on the memorandum filed, the undersigned assumes that the letter itself does not reflect specific restitution demands, but the

listing does.  Mr. Sargent can and will review the specific amounts/accounts provided, and he may

be able to provide a response by the time of sentencing.  If not, Mr. Sargent will request the court's

determination be postponed.

V.    GUIDELINE AND PSR ISSUES (NO EVIDENTIARY HEARING REQUESTED)

    A.    Para. 47:  Error in "Specific Offense Characteristic"

        Mr. Sargent maintains his single court trial issue for purposes of appeal.  Mr. Sargent

was charged with felony acts of theft for taking Postage Statements.  The defense at trial was limited

to the issue of value.  Mr. Sargent contended that there were no felony acts of theft because Postage

Statements themselves do not have a value exceeding $1,000.  The trial court erroneously determined

that the "value" of the stolen Postage Statements was the same as the estimates written on the forms.

    B.    Para. 125-28:  Error in "Restitution"

        However, regardless of the "value" of these documents for essentially documentary

or auditing purposes, it cannot be reasonably argued in this case that the removal of the Postage

Statements caused losses for which restitution should be ordered.  A loss of revenue occurred

because Mr. Sargent did not make entries into PostalOne! concerning his receipt of the mailing and

his observations of the type, weight, and quantity of the mailing.  Had Mr. Sargent made these

entries, PostalOne! would have computed the postage owed by the customer, registered a debit

against the customer's account, and generated the Post Office record (3607) of the transaction.

These omissions were not charged as crimes.

        While loss determinations may encompass relevant conduct, restitution must be

limited to losses directly and proximately caused by the offense of conviction. 18 U.S.C. § 3663A(b).

Circuit cases subsequent to Hughey v. United States, 495 U.S. 411, 413, 110 S. Ct. 1979, 109 L. Ed.

2d 408 (1990), <u>prohibit</u> the trial court from ordering restitution for conduct that is related to the offense of conviction, but which is not an element of the offense.  Only when the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, may the restitution order include acts of related conduct for which the defendant was not convicted.  *See United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir.1996).  Otherwise, *Hughey* and *United States v. Baker*, 25 F.3d 1452, 1456 (9th Cir.1994), continue to prohibit the inclusion of "loss [not] caused by the specific conduct that is the basis of the offense of conviction."  *Hughey*, 495 U.S. at 413, 110 S. Ct. 1979, *cited in United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999).

Therefore objection is made to the imposition of any restitution as lacking in statutory authority.  It cannot be said that Mr. Sargent's theft of postage statements was the direct and proximate cause of a loss here; it was Mr. Sargent's failures to enter the verification information into the PostalOne! system that caused the loss.  His disruption of the auditing trail was not the direct and proximate cause of the loss.

   C.     *Para. 105:  Financial Condition:  Ability to Pay*

The PSR writer reiterated the credit report run on May 9, 2006; however, Mr. Sargent has significantly reduced his credit balances, as he reported to her.  Also, in n.5, the PSR writer apparently misinterpreted the "LP" notation Mr. Sargent provided in his accounting to mean "limit pending," rather than last payment.

*VI.*    *OTHER REQUESTS*

Should this court find it necessary to impose some confinement as a sanction, Mr. Sargent requests that the court impose halfway house time as a condition of probation, which

would still allow Mr. Sargent to commence therapy, a course of anti-depression medication, substance abuse treatment, and job training if needed.

Mr. Sargent has previously indicated that he would be requesting "self-reporting" should this court impose a sentence of incarceration. "Self-reporting" is requested because the BOP treats persons who self-report differently – more favorably – from those who do not have that status. A lower security rating allows a defendant to move more quickly to minimum and camp facilities. Roger Prince, a current state employee and former FBI employee, has volunteered to accompany Mr. Sargent. Although self-reporting is not a third-party arrangement, Mr. Prince would gratuitously assume the responsibility of reporting Mr. Sargent should he not report as required or deviate from the itinerary provided to BOP.

DATED this 2nd day of August 2006.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
/s/ Mary C. Geddes
Assistant Federal Defender
Alaska Bar No. 8511157
601 West 5th Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mary_geddes@fd.org

21

Certification:

I certify that on August 2, 2006, a copy of the
foregoing document, with attachments, was
served electronically on:

Retta-Rae Randall, Esq.

and a copy was hand delivered on:

United States Probation/Pretrial Services
222 West Seventh Avenue, No. 48, Room 168
Anchorage, AK  99523

/s/ Mary C. Geddes